IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RAYMOND H. DENTON, JR.,

    Petitioner,                    No. CIV S-03-1558 RRB JFM P

    vs.

SILVIA GARCIA, Warden,

    Respondent.               FINDINGS AND RECOMMENDATIONS

_____/

          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2000 conviction on multiple charges of aggravated sexual assault on a child, lewd and lascivious conduct with a child under the age of fourteen, and inflicting corporal punishment on a child. This action is proceeding on petitioner's September 20, 2004 amended petition, in which he raises thirty-six claims.[1]

/////

---

[1] Respondent filed an answer to the amended petition on June 29, 2006. Therein, respondent answers thirty-five of the thirty-six claims in the amended petition. Respondent does not answer petitioner's twentieth claim for relief. For that reason, respondent's identification of claims in the answer is congruent for the first nineteen claims and thereafter differs from the amended petition. Those differences will be noted in the applicable sections of these findings and recommendations.

1

|     |     |
| --- | --- |
| 1   | FACTS[2] |

2    At the time of the events leading to petitioner's conviction, petitioner was
3 married. (RT at 142, 144.) Petitioner lived in an apartment on Greenholme in Sacramento with
4 his wife, their two natural children, and his wife's daughter. (Id. at 144-45.) Petitioner's
5 stepdaughter was the victim of the crimes with which petitioner was charged. (Id. passim). At
6 the time of the events at bar she was eleven years old. (Id. at 160.)

7    The following evidence was offered by the prosecution at trial. On the evening of
8 October 2, 1998, petitioner's wife returned home at 11:00 p.m. from her job as an assembly
9 operator. (Id. at 145, 147.) She arrived at home a half hour earlier than usual; due to car trouble,
10 she had received a ride home from her brother. (Id. at 147.) When she arrived home, she found
11 the door chained, which was unusual. (Id.) When she pushed the door open approximately two
12 and one half inches, she saw petitioner running naked from the sofa to the door. (Id. at 148.)
13 Petitioner pushed the door shut and then opened it about three seconds later. (Id. at 148-49.)
14 Petitioner's wife asked petitioner what he was doing and he told her he was waiting for her. (Id.
15 at 149.) Petitioner's wife, whose suspicions were raised by petitioner's unusual behavior,
16 looked around the first level of the house and proceeded upstairs. (Id.) She walked into her
17 bedroom and then proceeded to her childrens' room. (Id. at 150-51.) She heard her daughter
18 crying and noticed that she had the bedcovers "clenched over her head." (Id. at 151.)
19 Petitioner's wife pulled the covers back and discovered her daughter "completely naked." (Id.)
20 At that point, "everything clicked" for petitioner's wife, she asked petitioner, "'What did you
21 do?'" and she left and went to a neighbor's house to call the police. (Id. at 152.)

22    Shortly after she left, petitioner came to the neighbor's house but the neighbor
23 wouldn't let him in. (Id.) A few minutes later, petitioner's wife went back to her house and
24 asked petitioner to send her daughter outside. (Id. at 153.) Petitioner complied, and his

---

[2] The statement of facts is taken from the court's review of the Reporter's Transcript of Proceedings (RT) of petitioner's trial lodged by respondent on July 10, 2006.

1  stepdaughter came out and told her mother that petitioner had "made her have sex with him."
2  (Id.)

3     In June 1998, petitioner's stepdaughter had told her mother that petitioner had
4  made her have sex with him, and that it had been going on for eight months. (Id. at 154-56.)
5  Petitioner's wife took her daughter part way to a hospital, but en route petitioner had a private
6  conversation with his stepdaughter and the three of them returned home. (Id. at 158-59.) After
7  they returned home, petitioner's stepdaughter told her mother she had made everything up
8  because she was angry that she had not been allowed to spend the night at a friend's house. (Id.
9  at 159.)

10    Petitioner's wife also testified that she and petitioner had moved to the
11 Greenholme apartment at the end of June 1998. (Id. at 144.) They never had sex in the living
12 room of the Greenholme apartment, and that they "hardly ever" had sex once they moved to the
13 Greenholme apartment because petitioner's wife was pregnant when they moved there. (Id. at
14 160-61.)

15    Petitioner's stepdaughter testified that petitioner first molested her when she was
16 eleven years old. (Id. at 242.) At the time of the first incident, the family was living on Brattle
17 Court. (Id.) On another occasion while living at Brattle Court, petitioner made his stepdaughter
18 have sex with her in her parents' bedroom. (Id. at 244-249.)

19    Petitioner's stepdaughter testified to the events of October 2, 1998, when
20 petitioner again forced her to have sex. (Id. at 252-258.) She testified that "all of a sudden, the
21 sperm came out of his penis. And then, all of a sudden, we heard the door. And we heard keys.
22 And then my mom, she came and unlocked the door; but the chain was on the door. And I ran
23 upstairs." (Id. at 258.) Petitioner had ejaculated onto the carpet in the livingroom. (Id. at 259.)

24    Petitioner's stepdaughter testified that on the night of October 1, 1998, while her
25 mother was at work, petitioner beat her with a belt and forced her to have sex with him. (Id. at
26 264-66.) On that night, petitioner shook his penis on her comforter. (Id. at 268-69.) Between

3

1  the first incident on Brattle Court and October 2, 1998, petitioner touched her inappropriately a
2  couple of times a week. (Id. at 273.)
3          Petitioner's stepdaughter testified that she told her mother about the molestation
4  earlier in 1998, but that her mother didn't believe her and that petitioner told her to tell her
5  mother she made it up. (Id. at 275-76.)
6          Sacramento County Deputy Sheriff Kevin Mickelson testified that he responded
7  to petitioner's wife's 911 call on October 2, 1998. (Id. at 427.) Deputy Sheriff Mickelson
8  testified about statements made to him by petitioner's stepdaughter that night about the events of
9  October 1, 1998 and October 2, 1998. (Id. at 430-436.) His testimony was consistent with
10 petitioner's stepdaughter's testimony concerning those events. He also testified that officers
11 found a belt under the sheets on petitioner's stepdaughter's bed after the comforter was collected.
12 (Id. at 436-37.) Sacramento County Deputy Sheriff Kevin Childs testified that he collected a
13 comforter and pieces of carpet from the Greenholme apartment in the early morning hours of
14 October 3, 1998. (Id. at 447-451.) A criminalist, Cheryl Reynolds, testified that semen stains
15 were found on the carpet samples taken from the apartment, and that petitioner could not be
16 excluded as the source of those stains. (Id. at 496-99.) Ms. Reynolds also testified that the stains
17 might have "contain[ed] a contribution from another individual besides the source of a semen,"
18 and that if that were the case [petitioner's stepdaughter] could not be ruled out as the source
19 either. (Id. at 498.) Ms. Reynolds also testified that semen stains found on the comforter were
20 "consistent" with relevant types from petitioner, and that the specific combination of types "are
21 found in combination in approximately six percent of the black population, [and] approximately,
22 seven percent of the white population." (Id. at 501-03.)
23         Bradley Johnson, a chemist with the Sacramento County Crime Laboratory,
24 testified that he found a petroleum substance consistent with that found in Vaseline on one test
25 run on a penile swab taken from petitioner, and on fingernail scrapings taken from both of
26 /////

1 petitioner's stepdaughter's hands. (Id. at 662.) The presence of the petroleum substance in the
2 penile swab was only confirmed by one of the two tests run by Mr. Johnson. (Id. at 674.)

3       Sheridan Whalen, a family nurse practitioner employed by the Child Abuse
4 Response Examiner Center at the University of California Davis Medical Center testified that she
5 performed a sexual examination on petitioner's stepdaughter beginning at 1:35 a.m. on October
6 3, 1998. (Id. at 676, 687.) Ms. Whalen testified concerning petitioner's stepdaughter's report of
7 the rape and the results of her physical examination. (Id. at 687-705.) Her conclusion was that
8 petitioner's stepdaughter had been sexually assaulted. (Id. at 705.) Cathy Boyle, a pediatric
9 nurse practitioner employed by the Child Abuse Response Examiner Center at the University of
10 California Davis Medical Center performed a follow up examination of petitioner's stepdaughter
11 on October 14, 1998 and, together with three physicians, conducted a photo review of
12 petitioner's stepdaughter's case. (Id. at 781-793.) The conclusion of the review was that there
13 was "clear evidence of sexual abuse." (Id. at 794.)

14       The defense called Dr. Lee Coleman, an adult and child psychiatrist. (Id. at 824.)
15 Dr. Coleman testified that he had reviewed the medical examinations of petitioner's stepdaughter
16 conducted on October 3, 1998 and October 14, 1998. (Id. at 927.) He testified that following
17 such review he found "no evidence of injury" to the "sexual part of a child." (Id. at 930.)
18 Another defense witness, Dr. Eugene Abravanel, an internist, testified concerning petitioner's
19 history of herpes. (Id. at 1012-1020.) Dr. Abravanel also reviewed the reports of petitioner's
20 stepdaughter's medical examinations and testified to abnormalities in the examination process
21 and the findings made by the examiners. (Id. at 1028-1043.)

22       Petitioner also testified in his own defense. The essence of his defense was that
23 his stepdaughter's accusations were "untruthful." (see id. at 1266) Petitioner acknowledged
24 disciplining his stepdaughter with a belt, but only over clothing. (Id. at 1164.) He denied ever
25 seeing his stepdaughter naked. (Id.) Petitioner testified that the accusations against him started
26 with restrictions imposed on his stepdaughter after she received an F on a report card in 1998.

5

1  (Id. at 1161-67.) Petitioner testified that her first accusation against him was false and made
2  because he had told his stepdaughter that her friend could not spend the night because of her poor
3  grades. (Id. at 1177-78.) Petitioner testified that after this event "[his stepdaughter] realized she
4  had the upper hand" and she "started to slack on everything" because he "had to put the hands
5  off" because he didn't know whether she would accuse him again. (Id. at 1177, 1179.)

6  Petitioner's testimony concerning details of the trip to the hospital following his
7  stepdaughter's first accusation differed in several aspects from the testimony of his wife and his
8  stepdaughter. (See id. at 1180-82.) With respect to the events of October 2, 1998, petitioner
9  testified that he was preparing to take a shower at about 11:00 p.m. when he heard the chain
10 rattle on the front door. (Id. at 1228-29.) Petitioner had placed the chain on the door because as
11 he was returning home he had seen an unknown male coming from the sidewalk going to his
12 house. (Id. at 1230.) Petitioner testified that after his wife left the house he spoke with his
13 stepdaughter who told him that she had not been unclothed and that her mother was "tripping."
14 (Id. at 1240.)

15 Petitioner's testimony concerning the frequency and location of his sexual
16 relations with his wife also differed from his wife's. (Id. at 1247-1250.) Petitioner also testified
17 that, although he had told a police detective that he didn't know why his semen stain would be on
18 his stepdaughter's bedding, that wasn't true because "we slept on her bedding, on both blankets
19 many times." (Id. at 1254.)

20 In rebuttal, the prosecution called Dr. Angela Rosas, a pediatrician at the
21 University of California Davis Medical Center, who offered rebuttal testimony concerning
22 petitioner's history of chlamydia and herpes and confirmed the testimony of Ms. Whalen
23 concerning the results of the examination and review of petitioner's stepdaughter's case
24 conducted at the University of California Davis Medical Center. (Id. at 1332-1355.)
25 /////
26 /////

ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (<u>citing</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. <u>Williams</u>, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court

7

reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

II. Petitioner's Claims

    A. Ineffective Assistance of Counsel

Petitioner raises nineteen claims of ineffective assistance of counsel in his amended petition, claiming numerous instances of ineffective assistance by his trial and his appellate attorneys.[3]  Claims 1, 2, 7, 10, 11, 12, 13, 15, 16, 18, and 19 were presented to the California Supreme Court in a petition for writ of habeas corpus filed in that court on June 13, 2002.  (Lodged Document 21, lodged July 10, 2006.)  That petition was denied in an order filed February 11, 2003 that contained no statement of reasons for the decision.  (Id.)  Claims 21, 22, 23, 25, 26, 31, 33, and 34 were presented to the California Supreme Court in a petition for writ of habeas corpus filed in that court on July 9, 2003.  (Lodged Document 25, lodged July 10, 2006.)  That petition was denied in an order filed March 17, 2004 "as successive (see *In re Clark* (1993) 5 Cal.4th 750) and on the merits."  (Id.)

The only reasoned state court rejection of petitioner's ineffective assistance of counsel claims is the May 23, 2003 decision of the Sacramento County Superior Court denying a petition for writ of habeas corpus filed in that court.[4]  (Compare Lodged Document 22, lodged July 10, 2006, with Lodged Documents 21 and 25.)  That petition contains all of the ineffective assistance of counsel claims raised in this action.  (Lodged Document 22.)  Applying, inter alia, the two-part test for evaluating ineffective assistance of counsel claims set forth in Strickland v.

---

[3] Claims 1, 2, 7, 10, 11, 12, 13, 15, 16, 18, 19, 21, 22, 23, 25, 26, 31, 33, and 34. Respondent identifies petitioner's ineffective assistance of counsel claims as Claims 1, 2, 7, 10, 11, 12, 13, 15, 16, 18, 19, 20, 21, 22, 24, 25, 30, 32, and 33.  The claims identified by respondent in the answer as Claims 20, 21, 22, 24, 25, 30, 32 and 33 are in fact Claims 21, 22, 23, 25, 26, 31, 33 and 34 of the amended petition.

[4] The judge who denied the petition for writ of habeas corpus also presided over petitioner's trial.  See Lodged Document 22, Order issued May 23, 2003; RT at 116.)

<u>Washington</u>, 466 U.S. 668 (1993), the state superior court rejected the claims as follows:

> Petitioner has filed 33 claims of either ineffective assistance or prosecutorial misconduct. Taken together, these claims show that petitioner believes experts lied about DNA findings, sexual abuse findings, and herpes testing and that they concocted lab reports, videotapes and other test results to support their lies. He believes that police officers lied, that the victim, his stepdaughter, lied and that his wife, the victim's mother, lied. He further believes that the prosecutor collaborated in this effort and that his attorneys failed to attack these witnesses or evidence appropriately. . . .
>
> Petitioner's view of his trial is out of touch with reality. The evidence in petitioner's case came from testing for sexual abuse and child abuse, from experts at UC-Davis and other scientific experts and from law enforcement officials. Petitioner does not suggest any logical motive these experts would have for investing testimony or other evidence, and the court cannot think of any. The evidence also included sexual assault interviews with the victim, testimony by the victim and the account of the victim's mother. The jury was entitled to believe them and to disbelieve petitioner's account of the events. Petitioner's attorneys were not ineffective for failing to attack this evidence; they had no basis for doing so. Nor are petitioner's attorneys at fault for being unable to persuade the jury to follow petitioner's account. Petitioner has failed to raise any doubt about the outcome of the case, and the petition is denied.

(Lodged Document 22, Order issued May 23, 2003, at 2.)

In order to prevail on his claims of ineffective assistance of counsel, petitioner must show two things, an unreasonable error and prejudice flowing from that error. First petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. <u>Strickland v. Washington</u>, 466 U.S. 688 (1984). The court must determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. <u>Id.</u> at 690. "Review of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation." <u>United States v. Ferreira-Alameda</u>, 815 F.2d 1251 (9th Cir. 1986).

Second, petitioner must prove prejudice. <u>Strickland</u> at 693. To demonstrate prejudice, petitioner must show that "there is a reasonable probability that, but for counsel's

9

unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. The focus of the prejudice analysis is on "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

The court is not required to address the two parts of the Strickland test in the order set forth therein. See Strickland, at 697. As the Court stated in Strickland:

> In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

Id.

Petitioner's claims of ineffective assistance of counsel fall into several categories: challenges to counsels' alleged failure to properly investigate, follow up on, or offer at the preliminary hearing or at trial, evidence and witness testimony that petitioner contends would have been exculpatory and/or supported petitioner's defense (claims 1, 7, 11, 16, 23, and 34); alleged failure to hire proper and/or competent experts (claims 2, 25, and 26); failure to adequately impeach prosecution witnesses (claims 10, 18, 19, 21, 22, and 33); failure to adequately argue evidence that favored petitioner, to object to prosecution evidence, and to obtain independent test results to challenge prosecution evidence (claims 12, 13, and 15); and failing to move to suppress certain evidence offered at trial (claim 31).

Despite the numerous assignments of alleged error by his attorneys, the record reflects no cognizable prejudice to petitioner from anything of which he complains. The evidence against petitioner was overwhelming and petitioner has not shown any reasonable probability of a different outcome at his trial. The state courts' rejection of petitioner's nineteen

claims of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly established federal law. These claims should be denied.

B. Prosecutorial Misconduct

Petitioner raises twelve claims of prosecutorial misconduct in his amended petition.[5] Claims 3, 4, 5, 6, 8, 9, 14, and 17 were presented to the California Supreme Court in the petition for writ of habeas corpus filed in that court on June 13, 2002. (Lodged Document 21, lodged July 10, 2006.) As noted in section IIA, supra, that petition was denied in an order filed February 11, 2003 that contained no statement of reasons for the decision. (Id.) Claims 24, 28, 30 and 36 were presented to the California Supreme Court in the petition for writ of habeas corpus filed in that court on July 9, 2003. (Lodged Document 25, lodged July 10, 2006.) As noted in section IIA, supra, that petition was denied in an order filed March 17, 2004 "as successive (see *In re Clark* (1993) 5 Cal.4th 750) and on the merits." (Id.)

The only reasoned state court rejection of any of petitioner's prosecutorial misconduct claims is the May 23, 2003 decision of the Sacramento County Superior Court set forth to in section IIA, supra. (Compare Lodged Document 22, lodged July 10, 2006, with Lodged Documents 21 and 25.) That petition contains all but one of the prosecutorial misconduct claims raised in this action.[6] (Lodged Document 22.)

The state superior court did not set forth any specific standards for analysis of the prosecutorial misconduct claims. Instead, the rejection of those claims appears to have been based on the court's findings, also set forth supra, that

> [p]etitioner's view of his trial is out of touch with reality. The
> evidence in petitioner's case came from testing for sexual abuse

---

[5] Claims 3, 4, 5, 6, 8, 9, 14, 17, 24, 28, 30, and 36. Respondent identifies petitioner's prosecutorial misconduct claims as Claims 3, 4, 5, 6, 8, 9, 14, 17, 23, 28, 29, and 35. The claim identified by respondent in the answer as Claim 23 is in fact Claim 24, the claim identified by respondent as Claim 29 is in fact Claim 30, and the claim identified by respondent as Claim 29 is in fact Claim 36.

[6] Claim 9 of the instant petition is not raised in the state superior court petition.

11

> and child abuse, from experts at UC-Davis and other scientific experts and from law enforcement officials. Petitioner does not suggest any logical motive these experts would have for investing testimony or other evidence, and the court cannot think of any. The evidence also included sexual assault interviews with the victim, testimony by the victim and the account of the victim's mother. The jury was entitled to believe them and to disbelieve petitioner's account of the events. . . . Petitioner has failed to raise any doubt about the outcome of the case. . . .

(Lodged Document 22, Order issued May 23, 2003, at 2.)

Success on a claim of prosecutorial misconduct requires a showing that the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. Greer v. Miller, 483 U.S. 756, 765 (1987). The conduct must be examined to determine "whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." United States v. Simtob, 901 F.2d 799, 806 (9th Cir. 1990). Generally, if an error of constitutional magnitude is determined, a harmless error analysis ensues. Error is considered harmless if the court, after reviewing the entire trial record, decides that the alleged error did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 638 (1993). Error is deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's substantial rights." Kotteakos v. United States, 328 U.S. 750, 760-761 (1946).

All but one of petitioner's claims of prosecutorial misconduct are based on allegations of presentation of perjured testimony and/or false or misleading evidence. In claim 17, petitioner contends that the prosecutor committed misconduct by improperly discussing in front of the jury independent serological testing performed by the defense.

Despite the numerous allegations of perjury and/or false testimony, the record contains no evidence to support any of these claims. Petitioner has made no showing that the testimony he points to was perjured or the evidence against him intentionally false. The state courts' rejection of petitioner's claims of prosecutorial misconduct are neither contrary to, nor an unreasonable application of, clearly established federal law. These claims should be denied.

  C. Denial of Post-Conviction Motion for Substitution of Counsel

    In claim 20, petitioner contends that his Sixth Amendment right to effective assistance of counsel was violated by the trial court's denial of a post-conviction motion for substitution of counsel brought by petitioner pursuant to People v. Marsden, 2 Cal.3d 118 (1970) prior to sentencing.[7] This claim was presented to the California Supreme Court in the petition for writ of habeas corpus filed in that court on June 13, 2002. (Lodged Document 21, lodged July 10, 2006.) As noted in sections IIA and IIB, supra, that petition was denied in an order filed February 11, 2003 that contained no statement of reasons for the decision. (Id.) The last reasoned state court rejection of the merits of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.[8] (Lodged Document 19, People v. Denton, No. C026764, slip op. at 5-8.) The state court of appeal found "no basis for concluding that the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in declining to substitute counsel." (Id. at 8.)

    To resolve this claim, the court considers whether the trial court's denial of the motion caused petitioner to be "deprived . . . of the representation to which he was entitled by the Sixth Amendment." Schell v. Witek, 218 F.3d 1017, 1027 (9th Cir. 2000). Only if the conflict between petitioner and his attorney underlying the Marsden motion was sufficiently serious that the denial of the motion constituted "constructive denial of assistance of counsel," is prejudice presumed; otherwise, petitioner must also show that he was prejudiced by the conflict with his attorney and the denial of the motion. Id. at 1027-28.

    Petitioner brought numerous Marsden motions before and during trial, all of which were denied. On July 25, 2000, petitioner made a motion to represent himself pursuant to

---

[7] Respondent has not addressed this claim in her June 29, 2006 answer.

[8] The claim was also raised in the May 5, 2003 petition for writ of habeas corpus filed in the Sacramento County Superior Court. (Lodged Document 22.) The state superior court rejected the claim as having already been considered on appeal. (Id., Order issued May 23, 2003, at 1.)

Faretta v. California, 422 U.S. 806 (1975). That motion was granted. Thereafter, petitioner represented himself, making at least two unsuccessful attempts to withdraw his Faretta motion, until August 1, 2000, when a disruption by petitioner in the courtroom led the trial court to reappoint petitioner's former defense counsel to complete the trial. Thereafter, petitioner made several additional Marsden motions, all of which were denied. The motion at issue was made on October 13, 2000, at the start of petitioner's sentencing hearing. By the motion, petitioner sought new counsel in order to bring a motion for a new trial based on numerous allegations of alleged ineffective representation by petitioner's trial counsel. After an in camera hearing, the court denied the motion, finding that "no such grounds exist." (RT at 1618.)

After review of the record herein, the court finds no evidence that the trial court's denial of petitioner's October 13, 2000 Marsden motion caused him to be deprived of effective representation of counsel as guaranteed by the Sixth Amendment, nor is there any evidence that denial of that motion caused petitioner any cognizable prejudice. The state courts' rejection of this claim was neither contrary to, nor an unreasonable application of, controlling principles of federal law.

### D. Waiver of Right to Counsel and Reappointment of Counsel

In his twenty-seventh claim, petitioner contends that his waiver of right to counsel, made when his Faretta motion was granted, was involuntary. In his twenty-eighth claim, petitioner claims that the trial court violated his Sixth Amendment rights by reappointing petitioner's trial counsel to complete representation of petitioner at trial.[9] These claims were presented to the California Supreme Court in the petition for writ of habeas corpus filed in that court on July 9, 2003. (Lodged Document 25, lodged July 10, 2006.) As noted in sections IIA and IIB, supra, that petition was denied in an order filed March 17, 2004 "as successive (see *In re Clark* (1993) 5 Cal.4th 750) and on the merits." (Id.)

---

[9] In the answer, respondent identifies these claims as Claims 26 and 27.

1         In the twenty-seventh claim, petitioner contends that he was "forced" to make a <u>Faretta</u> motion when his trial counsel "failed to have [petitioner]'s wife submit to DNA testing, to have the alleged victim to [sic] submit to herpes testing, and to subpoena phone records, school records, that would have impeached the alleged victim and petitioners [sic] wife's testimony" as well as when trial counsel failed to impeach the prosecution's sexual assault experts and failed to secure competent experts for the defense.  Petitioner contends that he "should not have been forced to choose between incompetent counsel and self representation." (Amended Petition, at 83.)  The allegations in support of this claim also underlie several claims of ineffective assistance of counsel raised herein, none of which have any merit.  Those allegations cannot, therefore, support petitioner's claim that his <u>Faretta</u> waiver was involuntary.  <u>See</u> <u>Williams v. Stewart</u>, 441 F.3d 1030, 1047 (9th Cir. 2006).

        In Claim 27, petitioner contends that the trial court's subsequent decision to reappoint petitioner's trial counsel to complete representation of petitioner at trial, violated petitioner's Sixth Amendment right to counsel.  Petitioner contends that the deep conflict between petitioner and his trial counsel was manifest in the record and, therefore, that reappointment of his trial counsel was constitutional error.

        As noted in section IIC, <u>supra</u>, petitioner's trial counsel was reappointed to represent petitioner after petitioner, while representing himself, became disruptive in the courtroom.  Petitioner does not have a constitutional right to court-appointed counsel of his own choosing.  <u>See</u> <u>Wheat v. U.S.</u>, 486 U.S. 153, 159 (1988).  "[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented the lawyer whom he prefers."  <u>Id</u>.  Petitioner's allegations of conflict with his court-appointed attorney are grounded in petitioner's unfounded assertions that his trial counsel was ineffective in his representation of petitioner.  Under the circumstances of this case, this court finds no violation of petitioner's Sixth

/////

Amendment rights in the trial court's decision to reappoint petitioner's trial counsel following petitioner's disruptive outburst.  See Faretta, 422 U.S. at 834 n.46.

For the foregoing reasons, the state court's rejection of these two claims was neither contrary to, nor an unreasonable application of, clearly established federal law.  These two claims should be denied.

E.  Sufficiency of Evidence

Petitioner's thirty-second claim is that the sheriff's report was insufficient to support the state court's order after preliminary hearing holding petitioner over for trial. Petitioner also contends that the prosecutor "failed to investigate inconsistent statements and withheld material facts at the preliminary hearing." (Amended Petition, at 89.)  Petitioner's thirty-fifth claim is that there is insufficient evidence to support his conviction.

Petitioner has "no fundamental right to a preliminary hearing."  See Howard v. Cupp, 747 F.2d 510 (9th Cir. 1984) (citing Austin v. United States, 408 F.2d 808 (9th Cir. 1969)).  Moreover, it is apparent on the record before this court that there was overwhelming evidence of petitioner's guilt presented at trial.  There was no error in the decision to bind petitioner over for trial, and no constitutional infirmity in the quantum of evidence on which his conviction is based.  These two claims should be denied.

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

/////

/////

1  failure to file objections within the specified time may waive the right to appeal the District
2  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
3  DATED: October 10, 2007.

_____
UNITED STATES MAGISTRATE JUDGE

12
dent1558.157